IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| MARCELINO VARGAS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| vs. | § | 5-21-CV-00038-FB-RBF |
| | § | |
| CML SECURITY, LLC, YATES/SUNDT | § | |
| A JOINT VENTURE, | § | |
| | § | |
| *Defendants*. | § | |
| | § | |
| | § | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns the Motions for Summary Judgment filed by

Defendants CML Security, LLC, Dkt. No. 39, and Yates/Sundt, a Joint Venture, Dkt. No. 40. All

pretrial matters in this action have been referred for resolution, pursuant to Rules CV-72 and 1 of

Appendix C to the Local Rules for the United States District Court for the Western District of

Texas. *See* Dkt. No. 9. Authority to enter this recommendation stems from 28 U.S.C.

§ 636(b)(1)(B).

For the reasons set forth below, the Summary Judgment Motions, Dkt. Nos. 39 & 49,

should be **GRANTED**, and Defendants CML Security and Yates/Sundt should be granted

judgment as a matter of law on all claims asserted by Plaintiff Marcelino Vargas.

**Factual and Procedural Background**[1]

Plaintiff Marcelino Vargas sues Defendants CML Security and Yates/Sundt for injuries he sustained while working on a construction site for the Comal County Jail in New Braunfels, Texas. Yates/Sundt served as the general contractor for the project, and CML Security was one of its subcontractors. *See* M. Vargas Dep. 12:7-13; Yates-Sundt/CML Subcontract (Dkt. No. 40-2). CML Security's scope of work for the project included installing mesh roof paneling above the jail's four recreational areas. *See* CML Security RFA Resp., No. 3 (Dkt No. 40-6). The subcontract required CML Security to "furnish all labor, materials, tools, equipment, facilities, supervision, management, financing, services, shop drawings, submittals, testing, and all other items necessary for the proper execution and functioning" of CML Security's scope of work. Yates-Sundt/CML Security Subcontract § Scope of Subcontract Work.

Various people and entities assisted in CML Security's project. CML Security's project manager was Bill Bowling. Its project superintendent was Mike Gregory. The project engineer was Andy Phillips, and the foremen were Ben Rivard and Fausto Cuellar. All of these men worked at the site on a daily or near-daily basis. *See* M. Gregory Dep. 17:3-20:10; 24:14-25. CML Security also contracted with non-party staffing company MEMCO, Inc.[2] to provide temporary day laborers. *See* Marek Employment Management Company ("MEMCO") Temporary Labor Service Agreement (Dkt. No. 39 at 51-53); A. Phillips Dep. 121:18-123:20.

---

[1] This personal-injury action has a lengthy procedural background involving two removal attempts, as set forth in the Court's May 24, 2021, Report and Recommendation. *See* Dkt. No. 29. For present purposes, the Court recites only the facts pertinent to the pending summary judgment motions.

[2] Although Vargas appears to quibble with the precise terminology used to characterize MEMCO, he concedes that MEMCO is a "staffing company," and the evidence reflects as much. *See* Dkt. No. 41 at 1.

A written agreement governed MEMCO and CML Security's relationship. Pursuant to that Agreement, CML Security paid a premium—to include the laborer's rate of pay and an amount sufficient to cover MEMCO's worker's compensation premiums—and MEMCO in turn agreed to provide its "customer" CML Security with workers on a temporary basis. *See* MEMCO Temporary Labor Service Agreement ¶¶ I, III. In addition to providing the workers, MEMCO contracted to (1) directly pay them, including making all applicable withholdings; and (2) "provide worker's compensation and employer's liability coverage on all personnel assigned to provide work under th[e] agreement." *Id.* ¶¶ II, V.[3] CML Security, for its part, further agreed to bear the responsibility for providing "[d]irection and guidance in the establishment of work tasks and their accomplishment." *Id.* ¶ I. In aid of that obligation, CML Security agreed to (1) provide MEMCO workers with all "miscellaneous supplies necessary for MEMCO personnel to perform their tasks"; (2) "comply with all applicable safety laws"; and (3) ensure that MEMCO's employees complied with all safety laws and policies. *Id.* ¶ I, II. The Agreement, however, disavowed any employer-employee relationship between CML Security and MEMCO's workers, providing instead that "MEMCO personnel assigned to perform work under this agreement shall not in any sense be considered employees of [CML Security] or act in any sense as agents or represents of [CML Security]." *Id.* ¶ II.

Vargas—a native Spanish speaker and certified welder—was one of the workers MEMCO assigned to assist CML Security with the project. *See* M. Vargas Dep. 9:20-25; 16:12-18:8. CML Security assigned Vargas to assist Cuellar—who is also a welder and speaks both Spanish and English. *See* M. Gregory Dep. 46:23-47:4. According to Vargas, he received his

---

[3] MEMCO also contracted to name CML Security "as an alternate employer of employees provided under th[e] contract" *id.* ¶ V, for worker's compensation purposes, although there's no evidence that MEMCO actually did this.

daily instructions from either Cuellar or Phillips. *See* M. Vargas Dep. 43:6-16; 58:3-59:11; Vargas RFA No. 11. MEMCO didn't provide Vargas with a job description or instructions, let alone any safety training or equipment. MEMCO simply told Vargas when and where to report and that he might be required to wear fall-protection gear. *See* M. Vargas Dep. 18:20-19:25.

Vargas worked for CML Security for a few months. *See* M. Vargas Dep. 18:10-17. He spent the majority of that time working on the ground, although prior to his accident, Vargas helped Cuellar for a few days install mesh paneling on certain areas (Areas J and H) of the roof. *See* M. Gregory Dep. 51:1-52:24; 73:5-18; M. Vargas Dep. 45:6-20. During his time on the roof, CML Security supplied Vargas with fall-protection equipment—equipment Vargas had some prior experience using although he had always received assistance with it. *See* M. Gregory Dep. 78:15-18; M. Vargas Dep. 12:21-25; 20:16-21:10; 50:15-53:3.

On February 11, 2020, Cuellar tasked Vargas with assisting him in welding mesh panels on "Area F" of the roof. *See* M. Vargas Dep. 43:21-25; 46:16-21; 50:1-49:25; 58:7-59:11; M. Gregory Dep. 49:10-50:25. Foreman Rivard and two other CML Security employees were responsible for first placing the panels on the roof and then securing them with temporary clamps before Vargas and Cuellar commenced their work. *See* M. Gregory Dep. 53:8-55:10; 134:2-135:16; 138; M. Vargas Dep. 46:22-25. Vargas and Cuellar's job that day was to get on the roof and weld the panels to the top of the roof from the underside, working from the edges to the center. They would remove the clamps as they went. M. Gregory Dep. 50:17-25; 55:6-10; 63:18-22; 134:24-135:20; 144:2-7; M. Vargas Dep. 65:1-7. To the extent any panels appeared out-of-alignment, Vargas and Cuellar needed to first adjust them from the top of the roof. *See* M. Gregory Dep. 144:2-7. CML Security devised this installation plan allegedly based on industry

standards and discussed it with Yates/Sundt during daily job progress and huddle meetings. *See id.* 42:20-43:24; 63:11-25; 80:5-25; 135:2-12; 138:6-17.

The morning of February 11, Vargas went to CML Security's tool room to pick up his fall-protection equipment, which consisted of a harness supplied by CML Security and a rope grab allegedly approved by Yates/Sundt. Vargas then proceeded to Area F of the rooftop to align the panels before starting the weld-out from underneath. *See* M. Vargas Dep. 51:2-13; M. Gregory Dep. 80:13-83:23; 176:6-14; 262:11-263:1. While on the roof—but before commencing the alignment—Cuellar and another unknown person assisted Vargas with donning his fall-protection gear and securing it to the rooftop. *See* M. Vargas Dep. 50:15-25; 51:14-52:7. At some point the unknown third person left, and Vargas and Cuellar were alone on the roof. *Id.* 56:2-22. Vargas and Cuellar began working their way from the edge of the roof to the center. A few hours into the work, Vargas walked—for the first time—from the edge of the panels across an unwelded center roof panel to retrieve a tool. As Vargas walked, two center panels gave way. Vargas fell 26 feet onto the concrete recreation yard below. *See id.* 62:21-68:5; M. Gregory Dep. 161:24-162:16; 248:6-249.

Yates/Sundt and CML Security's post-accident investigation revealed that the center mesh panels Vargas walked on were neither welded in place nor clamped. *See* Ex. G at 12 to Pl. Resp.  (Dkt. No. 46-7).[4] Yates/Sundt further observed that the rope attached to Vargas's safety harness "did not seem to get tight or recoiled into [the proper] position." *Id.* at 8. But neither

---

[4] Although Yates/Sundt's accident investigation conclusions likely constitute inadmissible hearsay, *see Rock v. Huffco Gas & Oil Co., Inc.*, 922 F.2d 272, 279 (5th Cir. 1991), Yates/Sundt doesn't dispute that Vargas could introduce admissible evidence on this topic. Indeed, Gregory testified that after the fall he didn't see any clamps in place or around the roof. *See* M. Gregory Dep. 275:6-278:4. Accordingly, the Court will consider this evidence in this posture, notwithstanding Yates/Sundt's objections to it. *See Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017), as revised (Jul. 5, 2017).

CML Security nor Yates/Sundt determined *why* the panels weren't clamped or *why* Vargas's fall-protection equipment—which appeared to be correctly installed—didn't prevent his injuries. *See* M. Gregory Dep. 55:4-10; 134:2-25;160:2-163:16; 175:6-176:5; 221:3-222:20.

At the time of the accident, both MEMCO and CML Security carried separate workers' compensation insurance for their employees.  *See* Seiken Aff. (Dkt. No. 39 at 48-49) & Blanks Aff. (Dkt. No. 39 at 57-61). Vargas applied for and obtained workers' compensation benefits—including medical coverage and payment of 70% of his wages for 52 weeks—through MEMCO's policy. *See* Vargas Dep. 75:24-77:11; Dkt. No. 39 at 57-61.

Vargas now sues CML Security and Yates/Sundt for negligence and premises liability. *See* Orig. Pet. (Dkt. No. 1-2 at 5-12).[5] Defendants, Vargas's live Complaint contends, are liable for his injuries because they failed to: (1) ensure the site was properly maintained, inspected for fall risks, and supervised, allowing incompetent or unlicensed individuals to work on the rooftop either without safety harnesses or restraints or with defective safety equipment;  (2) implement, enforce, and supervise appropriate general worksite-safety rules or precautions; and (3) warn workers, including Vargas, of dangerous conditions on the worksite. *Id.* CML Security and Yates/Sundt each move for summary judgment. *See* Dkt. Nos. 39 & 40.

### Analysis

### A.     The Exclusive-Remedy Provision of the TWCA Precludes Vargas's Tort Claims against CML Security.

Pursuant to the Texas Worker's Compensation Act (TWCA), "[r]ecovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage . . . against the employer . . . for the death of or a work-related

---

[5] Vargas originally sued MEMCO as well but voluntarily dismissed his claims in light of his workers' compensation election. *See* Dkt. No. 14.

injury sustained by the employee." Tex. Lab. Code § 408.001(a). There's no dispute that Vargas

was an employee of MEMCO. *See* Vargas RFA Resp., No. 3 (Dkt. No. 40-5). But an employee

can have more than one employer under the TWCA**,** and each employer may raise the exclusive-

remedy defense as a bar to an employee's claims. *McQuagge v. Heil Trailer Int'l Co.*, 602 Fed.

App'x 977, 978 (5th Cir. 2015); *W. Steel Co. v. Altenburg*, 206 S.W.3d 121, 123 (Tex. 2006).

At issue is whether, for purposes of the TWCA, an employee of a temporary-employment

agency, such as MEMCO here, can also be the employee of the employment agency's client,

such as CML Security here. The requisite test is whether the client employer (CML Security) has

"the right to control the progress, details, and methods of operations of the [the employee's]

work." *Waste Mgmt. of Tex., Inc. v. Stevenson*, 622 S.W.3d 273, 277-79 (Tex. 2021); *see also*

*McQuagge*, 602 Fed. App'x at 979-80. To determine the meaning of "right to control" in this

dual-employee context, the Court focuses on "the factual question of who exercised the right to

control as a practical matter in the course of the parties' daily work." *Waste Mgmt. of Tex*, 622

S.W.3d at 279. Where an employee of a staffing provider works under the direction and control

of the staffing provider's client and both employers maintain workers' compensation policies,[6]

the employee is considered a dual employee of both the client and the staffing provider, and any

worker's compensation benefits pursued from either employer will be the employee's exclusive

remedy. *See Waste Mgmt. of Tex*, 622 S.W.3d at 277-78 (citing *Wingfoot Enters.*, 111 S.W.3d

134,143 (Tex. 2003); *see also McQuagge*, 602 Fed. App'x at 979-980.

---

[6] Under certain circumstances a non-subscribing employer may avail itself of a staffing agency's workers' compensation coverage. *See, e.g.*, *Gustafson v. Complete Mfg. Servs. Inc.*, No. 09-18-00415-CV, 2020 WL 4210499, at *4 (Tex. App.—Beaumont Jul. 23, 2020, no pet.). But, as discussed below, there's no genuine dispute that CML Security was also a subscriber at the time of Vargas's fall. Accordingly, the Court need not determine whether MEMCO qualifies as a "professional employer organization" within the meaning of the Texas Labor Code or whether MEMCO and CML Security were co-employers under the statute. *Cf.* Pl. Resp. at 10-11 (Dkt. No. 41).

1.     *For TWCA Purposes, Vargas Was a Dual Employee of Both MEMCO and CML Security*.

CML Security indisputably controlled the progress, details, and methods of Vargas's day-to-day activities at the time of his injury. Vargas himself testified that he received all job-related instructions from CML Security—not MEMCO. He further conceded in response to Yates/Sundt's requests for admission that he was working under CML Security's "control." Vargas RFA Resp. No. 4. Indeed, Vargas's live Complaint—which constitutes a judicial admission[7]—identifies CML Security as one of Vargas's employers. *See* Orig. Pet. ¶ 10 ("On or about February 11, 2020, Plaintiff was working in the course and scope *of his employment for Defendants*.") (emphasis added). There is, in short, no genuine disputed issue of material fact on this point.

The fact that the MEMCO Temporary Labor Service Agreement disavowed a dual-employment relationship isn't material because CML Security's actual control isn't controverted. Indeed, the contract itself provides that CML Security—not MEMCO—was responsible for providing Vargas with direction and guidance.[8] Nor is CML Security's failure to provide Vargas with safety training or all of his needed personal protective equipment relevant to the Court's determination. "The TWCA exclusive-remedy test is whether [CML Security] had the right to control [Vargas's] day-to-day activities, not whether it engaged in any of the traditional activities

---

[7] *See Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 108 (5th Cir. 1987) ("Factual assertions in pleadings are judicial admissions conclusively binding on the party that made them. Facts that are admitted in the pleadings are no longer at issue.") (quotations, citations, brackets, and ellipsis omitted).

[8] *See Waste Mgmt.*, 622 S.W. 3d at 283 ("[E]ven if the Master Agreement's independent contractor label were "considered" as a "factor," its bare existence does not create a genuine fact issue as to whether Waste Management actually had the right to control Stevenson. There is simply no evidence—whether in the contract or in the parties' behavior—indicating that the Master Agreement's independent-contractor label ever had any bearing on Waste Management's right to control the workers on its garbage-collection routes.").

of an employer." *Voelter v. Daimler Trucks N. Am., LLC*, 547 F. Supp. 3d 614, 623 (W.D. Tex. 2021) (rejecting plaintiff's argument that staffing company's client couldn't be considered a joint employer because it didn't provide plaintiff with safety training). Finally, the fact that Cuellar might've only provided Vargas general instructions on the date in question doesn't raise a genuine issue of material fact regarding CML Security's *right* to control Vargas's work.

> **2.**      *CML Security—as a Worker's Compensation Subscriber—Is Entitled to Invoke the TWCA's Exclusive-Remedy Provision.*

There's also no genuine dispute that CML Security and MEMCO subscribed to workers' compensation insurance policies or that Vargas received benefits under MEMCO's policy. Vargas testified under oath that he applied for and received worker's compensation benefits from MEMCO. And CML Security submitted an affidavit from its Risk Manager Eric Seiken attesting that the company was (and still is) a subscribing employer under the TWCA at the relevant time. *See* Seiken Aff. (Dkt. No. 39 at 48-49). In support, Seiken provides a "true and correct" copy of the workers' compensation policy's information page in effect at the time of Vargas's fall. *See id.*

Contrary to Vargas's assertions, neither the Workers' Compensation policy nor the MEMCO Temporary Labor Service Agreement[9] attached to Seiken's affidavit are subject to a valid hearsay objection such that those documents must not be considered in this posture. *See Kepner-Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 540 (5th Cir. 1994). CML Security authenticated both documents via Seiken's affidavit. Seiken's failure to specifically identify himself as CML Security's custodian of records isn't material where Seiken attested that as CML Security's Risk Manager he has personal knowledge that the insurance policy

---

[9] Although Seiken's affidavit incorrectly refers to the Temporary Labor Agreement as dated August 16 as opposed to August 6, this appears to be a simple typographical error. It doesn't indicate the document's lack of trustworthiness.

documents (and MEMCO Temporary Labor Service Agreement) attached to his affidavit are true and correct copies. *See Travland v. Ector Cnty., Tex.*, 39 F.3d 319, 1994 WL 612342, at *5 (5th Cir. Oct. 20, 1994) (explaining that under Rule 803(6), a business record can be authenticated by testimony of the "custodian" of the record or some "other qualified witness").

Most, if not all, of Vargas's objections to CML Security's summary judgment evidence—to the extent any of those objections might have some technical merit—amount to hyper technical objections to evidence for which there's no meaningful dispute that CML Security could present the evidence at trial in admissible form. *See Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017), as revised (Jul. 5, 2017) (on summary judgment, material may be presented in a form that would not, in itself, be admissible at trial, provided the presenting party shows it's possible to put the information in admissible form).

There's no genuine issue of material fact that (1) MEMCO is a staffing company that assigned Vargas to work for CML Security on a temporary basis; (2) CML Security exercised control over Vargas's work on a day-to-day basis, including on the date in question; (3) Vargas was injured while performing work for CML Security; (4) CML Security and MEMCO had worker's compensation coverage during the relevant period; and (5) Vargas elected to pursue benefits under MEMCO's policy.[10] Accordingly, the undisputed summary judgment evidence—whether or not CML Security technically presented it in admissible form—demonstrates that CML Security is entitled to judgment as a matter of law on Vargas's claims. Vargas's various evidentiary objections don't create a genuine issue of material fact, and are overruled.

---

[10] Indeed, Vargas concedes numbers one, two, three, and five in his deposition testimony, summary judgment response, or responses to requests for admission.

**B.**       **Summary Judgment is Similarly Warranted in Yates/Sundt's Favor**.

Yates/Sundt is also entitled to judgment as a matter of law on Vargas's negligence and premises-liability claims. Even assuming, solely for purposes of Yates/Sundt's summary judgment motion, that Yates/Sundt owed Vargas a duty of care, there's no evidence regarding the industry standards of care or that Yates/Sundt breached this duty, let alone that the breach caused Vargas's fall. Nor is there any evidence that Yates/Sundt had actual or constructive knowledge of an unreasonably dangerous condition on the roof such that Yates/Sundt could be held liable for failing to warn Vargas of it. Accordingly, summary judgment is warranted in Yates/Sundt's favor, and the Court need not address Yates/Sundt's various evidentiary objections.

        **1.**       *Vargas's Negligence Claim Fails for Lack of a Triable Issue on Breach and Causation*.

To ultimately prevail on his negligence claim against Yates/Sundt, Vargas would be required to prove at trial that (1) Yates/Sundt owed a legal duty; (2) Yates/Sundt breached that duty; and (3) Vargas suffered damages proximately caused by that breach. *See Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). A general contractor such as Yates/Sundt only owes a subcontractor and its employees like Vargas a duty of care if the general contractor "retains some control over the manner in which the contractor performs the work that causes the damage." *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 865 (Tex. 2021) (quotations omitted).

Both Vargas and Yates/Sundt spend a good deal of their briefing disputing whether Yates/Sundt retained actual or contractual control regarding the means and methods of CML Security's mesh panel installation. Ultimately, however, the Court need not reach that issue. Even assuming for purposes of Yates/Sundt's motion that Yates/Sundt owed Vargas a duty of

care, there's no triable issue concerning whether it breached that duty or whether any such breach caused Vargas's injuries.

Vargas alleges that Yates/Sundt breached its duty of care by (1) failing to "properly" monitor and enforce its "general safety" policies, such as by ensuring all subcontractors had adequate training to rig-up their harnesses and that barricades were properly erected; (2) approving CML Security's use of fall-prevention equipment without mandating that it first be inspected; and (3) approving CML Security's process of permitting workers to align roof panels without them first being "properly" secured. Pl. Resp. at 17-18. But "[a] general contractor that promulgates mandatory safety requirements and procedures owes only a narrow duty to ensure that those requirements and procedures generally do not unreasonably increase, rather than decrease, the probability and severity of injury." *JLB Builders, LLC v. Hernandez*, 622 S.W.3d 860, 865 (Tex. 2021). It's hard to imagine—and Vargas doesn't meaningfully articulate—any situation where Yates/Sundt's mandating the use of safety training and fall-protection equipment, or erecting safety barriers and cones[11] could've unreasonably increased Vargas's risk of injury. Vargas doesn't allege that he fell over any misplaced safety cones or barriers, or that Yates/Sundt approved the wrong type of fall-protection gear.

Vargas also doesn't identify any evidence—either from an expert or otherwise—regarding the construction industry standard of care in this context. The standard of care in the construction industry is not within the experience of a layman, and so expert testimony to establish the applicable standard of care is required in this context. *See FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 89 (Tex. 2004); *see also 3D/I + Perspectiva v. Castner Palms, Ltd.*, 310 S.W.3d 27, 31 (Tex. App.—El Paso 2010, no pet.) (construction-management firm's

---

[11] The evidence reflects that prior to Vargas's fall, Yates/Sundt employees placed cones and barricade tape on the rooftop. *See* M. Gregory Dep. 218:8-219:14.

supervisory duties required specialized knowledge in the construction-management firm industry). Even if it were not, there's no competent summary judgment evidence in the record on the topic. The fact that Vargas "could question Mike Gregory . . . to address any industry standards, regulations or fall prevention safety technical issues," Pl. Resp. at 19 (emphasis added), is insufficient to defeat Yates/Sundt's summary judgment motion. Regardless, Gregory testified that the means and methods by which CML Security was supposed to secure the panels conformed to industry standard and that Yates Sundt didn't do anything to contribute to Vargas's injuries. *See* M. Gregory Dep. 43:6-8, 311:18-21

Absent evidence of the applicable industry standard, there's no way to determine whether Yates/Sundt's actions or inactions would've breached it. Nor is a general citation to OSHA's regulation regarding the "installation of metal decking"—without more—sufficient to raise a genuine issue of material fact regarding an alleged breach. The undisputed summary judgment evidence reflects that CML Security implemented—with Yates/Sundt's knowledge—an installation process where all panels were to be clamped before commencing the alignment on top of the roof. The clamps were only supposed to be removed one-at-a-time as needed. Would removeable clamps of this sort satisfy OSHA's requirement that "metal decking shall be laid tightly and immediately secured upon placement to prevent accidental movement or displacement?" Occupational Safety and Health Administration, Safety and Health Regulations for Construction § 1926.754(e)(5)(i)). Without expert testimony on the topic, the Court can't say, and yet at this juncture it is Vargas's burden to provide competent summary judgment evidence to show a genuine, triable fact issue. Moreover, Vargas concedes that Yates/Sundt didn't assist in installing the mesh panels on the roof. *See* Vargas RFA Resp. No. 17. Nor is there any evidence that Yates/Sundt permitted—let alone directed— any CML Security employees, including

13

Vargas, to walk across an unwelded and unclamped panel. *See id.* Resp. No. 30; M Gregory

Dep.. 286:15-23. Finally, the fact that Yates/Sundt later revised the installation procedure to

require temporary tack welding of the panels before anyone could walk across them can't serve

as evidence of Yates/Sundt's negligence. *See* Fed. R. Civ. P. 407 (evidence of subsequent

remedial measures isn't admissible to prove negligence or culpable conduct); Pl. Resp. at 15

(conceding that such evidence is only relevant to the issue of control).

Further, even if Vargas could establish Yates/Sundt breached a duty of care, his

negligence claim would still fail for lack of causation. Vargas didn't designate an accident

reconstruction expert, and, ultimately, it's unclear why the panels—which CML Security

directed another employee to clamp down before Vargas started working on the roof[12]—weren't

clamped at the time of Vargas's fall. *See* M. Gregory Dep. 134:6-11 ("I don't know [why this

panel slipped causing Mr. Vargas's fall"); *id.* 275:6-12 ("There were clamps on originally, but

the day after the . . . accident . . . I didn't see a clamp up there"); *id.* 311:9-13 ("I don't know

what happened. You know, I wish I did, but I don't know what happened."). Had the panels been

clamped in place as intended, Gregory testified based on his 36 years of experience in the

industry, the panels would've been safe to walk across. *See id.* 84:9-15; 278:12-17. Indeed,

according to Gregory, he had never seen a clamp fail, *see id.,* and here there's no evidence to the

contrary. Vargas, in other words, does not point to a genuine disputed issue of material fact with

respect to causation.

---

[12] *See* M. Gregory Dep. 134:20-23; 135:13-20 (explaining that it was Ben Rivard's job to place the panels on top of the roof and clamp them in place).

14

A similar result pertains to the failure of Vargas's fall-protection equipment. Again, Vargas didn't designate an expert to opine regarding the cause of its failure.[13] Nor does Vargas point to any evidence suggesting why his fall-protection equipment—which appeared to be to be correctly installed—didn't protect him from the fall, let alone that Yates/Sundt's actions or inactions were a "substantial factor" in bringing about that lack of protection. *See Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995) (discussing the components of proximate cause). Vargas's contention that Yates/Sundt's failure to provide him with safety training or inspect the fall-protection gear on day of the fall caused his injuries constitutes "mere conjecture, guess, or speculation" insufficient to raise a genuine issue of material fact on the issue of causation. *See id.*

### 2. *Vargas's Premises Liability Claim Also Fails; There's No Evidence Yates/Sundt Knew of a Dangerous Condition on the Roof.*

Summary judgment is also warranted on Vargas's premises liability claim. There's no evidence that Yates/Sundt had actual or constructive knowledge that the rooftop panels weren't secured such that a duty to warn would've arisen. *See United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 474 (Tex. 2017) (discussing the duty a general contractor owes to its business invitees). As discussed above, the competent summary judgment record reflects that CML Security informed Yates/Sundt that the panels would be *clamped* in place. Clamped panels, according to Gregory, would've been safe to walk across. There's no evidence that Yates/Sundt actually or constructively knew that the panels at issue weren't in fact clamped.

---

[13] *See Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 348 (Tex. 2015) ("We have consistently required expert testimony and objective proof to support a jury finding that a product defect caused the plaintiff's condition."); *see also  Leitch v. Hornsby*, 935 S.W.2d 114, 119 (Tex. 1996) ("[W]hether proper lifting equipment would have prevented the [work place] injury is not a question that can be answered by general experience").

Vargas doesn't argue that Yates/Sundt owed him a duty to inspect the roof to ensure the panels were clamped before he started his work. Rather, Vargas argues that Yates/Sundt knew or should've known that the installation process used by CML Security created a dangerous condition because, in his lay opinion, the panels could've been dislodged during the alignment process. *See* Pl. Resp. at 20. them. But Vargas fails to point to any evidence raising a genuine issue of material fact regarding the safety of clamped panels as Gregory testified. The fact that Yates/Sundt may have been aware of a safer and feasible alternative welding procedure, without more, is insufficient to impose constructive knowledge of a hazardous condition on Yates/Sundt. *See E.I. DuPont de Nemours & Co. v. Roye*, 447 S.W.3d 48, 61 (Tex. App.—Houston [14th Dist.] 2014, pet. dism'd). Accordingly, judgment as a matter of law is warranted on Vargas's premises-liability claim.

## Conclusion and Recommendation

For the reasons discussed above, it is recommended that the Summary Judgment Motions, Dkt. No. 39 & 49, be **GRANTED**.

Having considered and acted upon all matters for which the above-entitled and numbered case was referred, it is **ORDERED** that the above-entitled and numbered case is **RETURNED** to the District Court for all purposes.

## Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy by certified mail, return receipt requested, to those not registered. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is

modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The objecting party

shall file the objections with the clerk of the court, and serve the objections on all other parties. A

party filing objections must specifically identify those findings, conclusions, or

recommendations to which objections are being made and the basis for such objections; the

district court need not consider frivolous, conclusory, or general objections. A party's failure to

file written objections to the proposed findings, conclusions, and recommendations contained in

this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*,

474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000).

Additionally, failure to timely file written objections to the proposed findings, conclusions, and

recommendations contained in this report and recommendation shall bar the aggrieved party,

except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual

findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto.*

*Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

     **IT IS SO ORDERED**.

     SIGNED this 5th day of July, 2022.

RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE